UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| Be Green Packaging, LLC, ) | |
| ) | |
| ) | Civil Action No. 9:19-3273-BHH |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | **OPINION AND ORDER** |
| Shu Chen, ) | |
| ) | |
| ) | |
| Defendants. ) | |

This matter is before the Court on Plaintiff Be Green Packaging, LLC's ("Be Green") motion for preliminary injunction (ECF No. 7), and Defendant Shu Chen's ("Chen") motion to dismiss for lack of subject matter jurisdiction, personal jurisdiction and improper venue (ECF No. 9). For the reasons set forth herein, the Court denies Be Green's motion and denies Chen's motion.

**BACKGROUND**

Be Green is a provider of environmentally friendly packaging goods and services. It specializes in designing, manufacturing, and distributing compostable packaging products. Be Green asserts that its packaging designs and the configuration of its manufacturing processes are proprietary to Be Green and crucial to its ongoing success.

Chen is a former Be Green officer and Board member. Chen was Be Green's Executive Vice President of Technology, among other roles he held at the company. In that position, he oversaw Be Green China's manufacturing processes and the development of product designs company wide. He was involved in and had extensive knowledge of Be Green's manufacturing technology, and led the development effort for new processes and designs. Be Green alleges Chen had and still has contractual

1

obligations to assign inventions related to Be Green's business to Be Green, and to not disclose confidential information concerning Be Green technology and business. The parties paint dramatically different pictures of the relevant factual background pertaining to this case.

Be Green contends that Defendant has breached his contractual obligations in ways that have caused and are continuing to cause irreparable harm to Be Green. Specifically, Chen has filed patent applications in China that Be Green asserts disclose its confidential and proprietary processes and equipment configurations. Be Green further asserts that Chen has worked closely with Zume, Inc. ("Zume") to set it up as a competitor of Be Green, using Be Green's confidential and proprietary equipment configurations, all while serving on Be Green's Board of Directors. Be Green now seeks the following preliminary injunctive relief:

> 1) An order preliminarily enjoining Defendant from filing further patent applications relating to molded pulp and fiber packaging and equipment used for its manufacture, without first receiving approval from Be Green and assigning such applications to Be Green;
>
> 2) An order requiring Defendant to provide a complete list of, and to assign to Be Green, all currently existing patent applications and patents related to the area of molded pulp and fiber packaging, on which Defendant is an inventor;
>
> 3) An order requiring Defendant to provide any assistance necessary with respect to the filing of foreign counterparts to, or prosecution of, any currently existing patent applications and patents related to the area of molded pulp and fiber packaging, and on which Defendant is an inventor;
>
> 4) An order preliminarily enjoining Defendant from assisting Zume and other competitors of Be Green in setting up Be Green's equipment designs and configurations (including its Flexible Manufacturing Cell technology) at such competitors' facilities; and
>
> 5) An order preliminarily enjoining Defendant from further disclosing Be Green's confidential information.

(ECF No. 7 at 2.)

In October 2015, when Chen was made Executive Vice President of Technology, he entered an employment agreement with Be Green (the "2015 Agreement"). (Brown Decl. ¶ 10, ECF No. 7-2; *see also* Ex. A, ECF No. 7-3.) Be Green and Chen entered into a second, similar agreement in January 2018 (the "2018 Agreement"). (Brown Decl. ¶ 11; *see also* Ex. B, ECF No. 7-4.) Both agreements included provisions for the assignment of intellectual property to Be Green, protection of Be Green's confidential information, and non-competition by Defendant.

The confidentiality provision in the 2015 Agreement ("Confidentiality Provision") states in pertinent part:

> Executive will keep in strict confidence, and will not, directly or indirectly, at any time, during or after Executive's employment with the Company, disclose, furnish, disseminate, make available or, except in the course of performing Executive's duties of employment, use any trade secrets or confidential business and technical information of the Company or its customers or vendors, without limitation as to when or how Executive may have acquired such information.

(Ex. A ¶ 6(e)(i).) The confidentiality provision in the 2018 Agreement is substantially identical. (Ex. B ¶ 1(j)(i).) The assignment provision in the 2015 Agreement ("Assignment Provision") states in pertinent part:

> Executive agrees that upon conception and/or development of any idea, discovery, invention, improvement, software, writing or other material or design that: (A) relates to the business of the Company, or (B) relates to the Company's actual or demonstrably anticipated research or development, or (C) results from any work performed by Executive for the Company, Executive will assign to the Company the entire right, title and interest in and to any such idea, discovery, invention, improvement, software, writing or other material or design.

(Ex. A ¶ 6(f)(i).) The assignment provision in the 2018 Agreement is substantially identical. (Ex. B ¶ 1(k)(i).) The non-competition provision in the 2015 Agreement ("Non-Competition

3

Provision") states:

> While employed by the Company, Executive will not compete with the Company anywhere in the world. In accordance with this restriction, but without limiting its terms, while employed by the Company, Executive will not: (A) enter into or engage in any business which competes with the Company's business; (B) solicit customers, business, patronage or orders for, or sell, any products or services in competition with, or for any business that competes with, the Company's Business; (C) divert, entice or otherwise take away any customers, business, patronage or orders of the Company or attempt to do so; or (D) promote or assist, financially or otherwise, any person, firm, association, partnership, corporation or other entity engaged in any business which competes with the Company's business.

(Ex. A ¶ 6(b)(i).) Again, the non-competition provision in the 2018 Agreement is substantially identical. (Ex. B ¶ 1(b).) Be Green asserts that Chen has not honored these contractual obligations.

Be Green alleges that in October 2017, it authorized Chen to build a prototype Flexible Manufacturing Cell ("FMC") for use in manufacturing molded fiber packaging. (Brown Decl. ¶ 18.) Be Green contends that this technology offers a unique opportunity to increase its production processes, and that any public disclosure of the details of said technology harms Be Green's competitive advantage in this area. Be Green asserts that, unbeknownst to Be Green, Chen filed six patent applications related to the FMC technology through an affiliated Chinese company he beneficially controls called "Shurcon," sometimes translated in English as, "Shukang." (*Id.* ¶¶ 23–39.) Be Green further asserts that Chen never informed Be Green of these filings, and intentionally deceived Be Green's Chairman of the Board, its CEO, and one of its Board members, telling them each in separate communications that the FMC technology could not be patented even as he was filing multiple patent applications for the technology in the name of the company he controls. (*Id.* ¶¶ 21–22.)

In mid-2018, Be Green began working with Zume to develop compostable pizza boxes, which Be Green contends it intended to produce using FMC technology. (*Id.* ¶ 40.) Be Green asserts that Chen led Be Green's efforts to create tooling for, and prototypes of, pizza boxes for the project, with the ultimate goal of entering into a supply agreement with Zume. (*Id.* ¶ 42–43.) Be Green alleges that Chen exploited his position as an officer, Board member, and President of Be Green China, as well as his personal involvement in developing a product design for Zume, to divert this opportunity from Be Green to Shurcon, entering into a Joint Development Agreement with Zume in July 2019 ("Zume JDA"). (*Id.* ¶ 45–46.) Be Green contends that the purpose of the Zume JDA is for Shurcon to provide FMC equipment to Zume, enabling Zume to manufacture its own pizza boxes. (*Id.* ¶ 47.) Be Green further contends that in October 2019, Zume posted an online video showing compostable pizza boxes being made using FMC technology, to the surprise of Be Green. (*Id.* ¶ 48.)

Be Green confronted Chen about his actions, which Be Green alleges constitute breaches of his contractual obligations not to disclose Be Green's proprietary and confidential FMC technology to competitors, and sought a written commitment from Chen to desist from those actions and recommit to his contractual agreements with Be Green. (*See* Exs. 2–4 to Brown Decl., ECF Nos. 7-13–7-14.) In November 2019, when Chen refused to sign Be Green's draft commitment, Be Green terminated Chen's employment at Be Green. (Brown Decl. ¶ 49.) According to Be Green, it brought this lawsuit against Chen only after he refused to assign pertinent patent applications to Be Green, refused to commit to honoring his confidentiality obligations going forward, and refused to cease his work with Zume. (*Id.* ¶ 50.)

Meanwhile, Chen contends that Be Green's complaint oversimplifies the true context of the parties' relationship, a context that transcends a routine dispute between an employer and employee and includes a long and varied history as well as numerous other entities, both domestic and foreign. Chen distinguishes between the mission and capabilities of Be Green and Shurcon as follows:

> Be Green US is a packaging company: it makes and supplies packaging for a variety of consumer products. Chen is an investor in, and was an employee of, Be Green US, particularly as it navigated suppliers of tooling and processes in China. Be Green US also was a customer of Chen's Chinese company, Shurcon, which designs, develops, and builds tooling and machinery, including for use in the manufacture of packaging products. Importantly, before a company like Be Green US can mass produce packaging, it must purchase tooling and machinery from Shurcon or a similar entity. For years, the parties dealt with one another as customer and client; however, following the acquisition of Be Green US by a private equity company, Be Green US has sought to usurp the property and rights of Shurcon (a Chinese non-party), and seeks to do so through this injunction motion by seeking assignment of intellectual property and other takings or restrictions on Shurcon vis-à-vis Chen.

(ECF No. 30 at 8.)

Chen's response to the motion for preliminary injunction asserts an expanded timeline and list of entities as being relevant to this proceeding. First, Chen explains that he was born in Shanghai, China but is now an American citizen who has lived in Illinois since 1990, and that he is an engineer and entrepreneur with extensive experience in tooling, machining, and developing products, including products related to packaging materials. (Chen Decl. ¶ 3, ECF No. 30-1.) Next, Chen states that he founded Shurcon in Zhejiang Province, China in 2005, and that since its formation Shurcon has developed tools and machines for specialized manufacturing processes, including the manufacture of packaging products. (*Id.* ¶ 4.) Shurcon remains based in Zhejiang Province and currently employs 161 individuals, with 21 employees devoted to engineering and

research and development. (*Id.*) Chen states that he also founded Jiangsu Lu Sen Packaging Co., Ltd. ("Lu Sen") in Xuzhou, China in 2011, that Be Green US owned a 30% stake in Lu Sen at the time, that Lu Sen was formed to be a supplier of packaging products to Be Green US, and that Shurcon was providing Lu Sen with tooling and machinery no later than 2013. (*Id.* ¶ 5.) Chen contends that Shurcon's design, development, and manufacture of custom and semi-custom tooling and machinery for Lu Sen to use in manufacturing molded fiber packaging products has continued uninterrupted from 2013 to the present, including after Lu Sen became known as Be Green China. (*Id.*)

Chen further explains that Be Green US was founded in or around 2007 in Santa Barbara, California and is a "manufacturer of specialty molded fiber packaging for food service, a wide range of consumer packaged goods, as well as e-commerce applications." (Compl. ¶ 2, ECF No 1.) He contends that Be Green US does not design or develop tooling or machinery for mass packaging production. (Chen Decl. ¶¶ 10 & 15.) Chen states that he first became involved with Be Green US in 2009, while he was serving as the President of Prince Industries (Shanghai), Ltd., and that his initial involvement with Be Green US related to the design and development of its first packaging product for Proctor & Gamble. (*Id.* ¶ 6.)

Chen notes that in December 2013, a majority interest in Be Green US was purchased by The Riverside Company ("Riverside"), a private equity firm headquartered in Cleveland, Ohio. (*Id.* ¶ 7.) Chen asserts that at the time Riverside performed its due diligence on and purchased Be Green US, Lu Sen was and had for years been operating as an independent supplier of molded fiber packaging to Be Green US. (*Id.*) He further asserts that Riverside was fully aware of Chen's involvement with both Lu Sen and its

tooling and machinery supplier Shurcon. (*Id.*) Moreover, Chen states that at the time of Riverside's investment, he was solicited to invest in Be Green US and ultimately did invest $1 million into the company as part of the transaction involving Riverside. (*Id.*) Chen also became a member of the Board of Directors of Be Green US. (*Id.*)

Chen contends that until 2015, Lu Sen operated as an entity independent from, and a supplier of molded fiber packaging to, Be Green US. (*Id.* ¶ 8.) In December 2015, Be Green US purchased the remaining 70% of Lu Sen's shares, and Lu Sen became a subsidiary of Be Green US, thereafter known as Be Green China. (*Id.*) At that time, Chen invested another $1 million in Be Green US. (*Id.*) To this date, Chen remains a significant individual shareholder of Be Green US. (*Id.*)

By December 2015, as a result of Be Green US's purchase of Lu Sen, Chen became an employee of Be Green US, entering into the 2015 Agreement described above. (*Id.* ¶ 9.) Chen contends that in order to avoid claims of the type now raised, the agreement included a specific carve out expressly intended to allow Chen, as a principal of Shurcon, to continue his work for that company, including the design, development, and sale of molded fiber tooling, technology, and equipment (the "Permitted Activities Clause"). (*Id.*) Chen states that the Permitted Activities Clause was intended to allow him to perform work for Shurcon that was entirely separate from his relationship with Be Green US and that would not violate any duty that he had to Be Green US. (*Id.*) The Permitted Activities Clause provides as follows:

> The covenants set forth in this Section 6(b) shall not apply to the activities of [Chen], or Zhejiang Shukang Hardware Co., Ltd. and/or Shanghai Shukang Import & Export Co., Ltd., each of which are under the majority beneficial control of [Chen], to the extent such activities are specifically set forth on **Exhibit A** and conducted by [Chen], Zhejiang Shukang Hardware Co., Ltd. and/or Shanghai Shukang Import & Export Co., Ltd. as of the

Effective Date.

(ECF No. 1-1 § 6(b)(v).)[1] Exhibit A to the 2015 Agreement, titled "Permissible Activities," in turn specifies that Chen and Shurcon are permitted to engage in the "manufacture, development and sale of equipment, molds and technology used to manufacture molded fiber products" as well as any other activities agreed in writing between Be Green US and Chen. (*Id.* at 11.)

Chen contends that all parties understood the import and meaning of the Permitted Activities Clause, particularly because it was consistent with the historical operation and separation of the entities: it allowed Chen and Shurcon to continue to conceive, design, develop, build and sell tooling and machinery to be used for manufacturing molded fiber products, and to enjoy the benefits of that tooling and machinery, whether used for Be Green US or any other entity that produced molded fiber products. (Chen Decl. ¶ 10.) Chen asserts that he and Shurcon had been engaged in this business related to tooling and machinery, wholly separate and apart from any Be Green entity, since at least 2012. (*Id.*) Moreover, Chen asserts that the same provision, backed by the same understanding, and reinforced by two years of Chen's continued and separate work for Shurcon, was incorporated into the 2018 Agreement. (*See* ECF No. 1-2 § 1(d) & Ex. A.)

Perhaps in an effort to demonstrate the absence of any impermissible competitive intent toward Be Green, Chen states that during the time period in which he was fulfilling his responsibilities to Be Green and simultaneously continuing separate efforts for Shurcon, from 2015 to 2019, he provided nearly 20 bridge loans to Be Green US or its subsidiaries, and that many of these loans were provided when Be Green US was facing

---

[1] As stated above, "Shurcon" and "Shukang" are synonymous for the same entity.

significant financial pressure. (Chen Decl. ¶ 11 & Ex. 1.) Chen further states he has made long-term loans to Be Green US in the total amount of approximately $1.4 million, some of which was originally due to be repaid in 2017, and of which approximately $830,000 remains outstanding and past due. (*Id.*)

Chen also paints a very different picture about the origin of the FMC technology and the parties' respective knowledge regarding its progress. Chen contends that Shurcon began to develop pulp molding manufacturing equipment during the first half of 2015 as part of its mission to develop manufacturing technology to produce environmentally friendly packaging products. (*Id.* ¶ 12.) Chen spearheaded the project, which was based out of Shurcon's Zhejiang facility. (*Id.*) In May 2015, Shurcon filed its first five Chinese patents related to pulp molding equipment. (*Id.*) Starting in August 2016, Shurcon engineers began to investigate the use of robotic arms for trimming and laminating pulp molded products. (*Id.*) Chen avers that in October 2016, while working on a pulp-molding tooling project for a Taiwanese company, a number of Shurcon engineers observed a production process that provided further inspiration for the FMC concept, which uses a robot to transfer the product between stations, as opposed to a human. (*Id.*) Chen states that this process was different than any production process then in use by Be Green US or Be Green China. (*Id.*)

Chen asserts that the initial intent behind developing the FMC technology was to build a low-cost tooling solution, improve production efficiency, and provide flexibility for manufacturers. (*Id.* ¶ 13.) Chen counters an assertion in Be Green CEO, Jim Brown's declaration—that mass production of a specific product was one of the goals of the FMC technology as conceived (*see* Brown Decl. ¶ 15)—and states instead that the goal was

10

to increase efficiency in the production of customizable products generally. (Chen Decl. ¶ 13.) Chen further states that all work on the FMC technology and concept was performed by Shurcon's engineering teams (who were not affiliated with Be Green US or Be Green China). (*Id.*) Moreover, Chen asserts that neither Be Green US nor Be Green China made any investment—in the form of time, money, resources, research, personnel, or otherwise—in the development of FMC technology, and the development of the technology was entirely separate from Chen's work for Be Green. (*Id.*)

Regarding the timeline of FMC development, Chen states that Shurcon engineers spent the spring of 2017 developing automatic forming machines and robotic arms, both aspects of Shurcon's FMC technology concept. (*Id.* ¶ 14.) Chen asserts that, around the same time, he disclosed to Be Green US management that he was working at Shurcon on developing a new manufacturing concept—namely, a Flexible Manufacturing Cell. (*Id.*) Chen contends Be Green US indicated that it was more interested in procuring mass-production externally, and was focused on product, not the tooling and machinery that were Shurcon's expertise. (*Id.*) He further contends that Be Green US was facing significant financial difficulties at the time and was trying to mitigate the company's losses, not invest in costly tooling and machinery research and development. (*Id.*) Chen asserts that, as in the past, and with Be Green US's full knowledge and acquiescence, Shurcon completed its FMC development cycle without using any resources or personnel of Be Green US or Be Green China. (*Id.*)

Chen states that by July 2017, the team of Shurcon engineers had completed their FMC prototype design, and by October 2017, the prototype had completed its first successful test. (*Id.* ¶ 16.) He notes that throughout the summer and fall of 2017, Be

Green US Board Meeting minutes made no mention of the FMC technology. (*Id.*) Chen contends that in October 2017, based in part on his understanding that Shurcon's FMC technology was unlikely to be patentable in the United States, Shurcon decided to file for patent protection in China with dual goals: (1) to protect the technology into which Shurcon exclusively had invested its time, resources and money; and (2) to achieve a "High Tech Enterprise" designation from the Chinese government, which awards companies with certain tax incentives. (*Id.* ¶ 17.) All of the Chinese patent applications related to the FMC technology identified Shurcon as the applicant/assignee. (*Id.*) Shurcon engineers Gang Cen and Weimin Chen, along with Shu Chen—the individuals who had developed the technology—were listed as the inventors of the technology disclosed in the patent applications. (*Id.*)

By November 2017, Shurcon had developed its first full workable prototype for the FMC technology. (*Id.* ¶ 18.) Chen asserts that Be Green was aware of this fact, and in 2018, Shurcon began receiving orders from Be Green China, as well as other buyers, for the FMC technology. (*Id.*) Chen further asserts that Be Green purchased Shurcon machines containing FMC technology on at least May 5, 2018, May 15, 2019, and June 5, 2019, and has placed orders for two additional machines since this lawsuit was filed. (*Id.*) Chen states that in May 2018, Be Green US executives began to inquire with Shurcon as to costs related to the FMC technology, and in October 2018, FMC development was listed as a "line item" under "Key Success Factors" for the business— even though by that point, Shurcon had not only already developed the FMC technology, but was fulfilling Be Green's purchase orders for that technology. (*Id.*)

Be Green filed the instant motion for preliminary injunction on December 17, 2019.

12

(ECF No. 7.) Chen filed his motion to dismiss for lack of subject matter jurisdiction, personal jurisdiction, and improper venue on December 20, 2019. (ECF No. 9.) The case was subsequently reassigned to the undersigned. (ECF No. 18.) With respect to the motion for preliminary injunction, the parties have submitted the following briefing: (1) Chen filed a response in opposition on January 14, 2020 (ECF No. 30); Be Green filed a reply on January 21, 2020 (ECF No. 35); Be Green filed a supplemental memorandum in support on June 5, 2020 (ECF No. 42-1); Chen filed a supplemental response on June 18, 2020 (ECF No. 44); Be Green filed a supplemental reply on June 25, 2020 (ECF No. 45). With respect to the motion to dismiss for lack of jurisdiction and improper venue, the parties submitted the following briefing: Be Green filed a response in opposition on January 17, 2020 (ECF No. 33); Chen filed a reply on January 24, 2020 (ECF No. 39). These matters are ripe for consideration and the Court now issues the following ruling.

## **STANDARD OF REVIEW**

**Preliminary Injunction**

The Supreme Court has stressed that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) ("Because preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power, this Court should be particularly exacting in its use of the abuse of discretion standard when it reviews an order granting a preliminary injunction." (quotation marks and citation omitted)). To obtain a preliminary injunction, the moving party must establish: "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips

in his favor, and (4) that an injunction is in the public interest." *Id.* at 20. The party seeking the injunction bears the burden to establish each of these elements by a "clear showing." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *cert. granted, judgment vacated on other grounds*, 559 U.S. 1089 (2010), and *adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010). A court's issuance of mandatory injunctive relief, as opposed to prohibitory, should be especially sparing, because "[m]andatory preliminary injunctions do not preserve the status quo . . . ." *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980).  The Fourth Circuit has stated, "Mandatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (citations omitted); *see also Pashby*, 709 F.3d at 319 (stating that when the preliminary injunction at issue is mandatory rather than prohibitory in nature, the standard of review is "even more searching").

**Federal Rule of Civil Procedure 12(b)(1) – Subject Matter Jurisdiction**

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a cause of action based on lack of subject matter jurisdiction. "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (quoting *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986)). "When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." *Richmond, Fredericksburg &*

14

*Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982)). "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* "The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Id.* (citing *Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1559 (9th Cir.1987)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (citing *Trentacosta*, 813 F.2d at 1558).

**Federal Rule of Civil Procedure 12(b)(2) – Personal Jurisdiction**

When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden of showing that jurisdiction exists. *See In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997). If the Court addresses the issue of jurisdiction on the basis of pleadings and supporting legal memoranda without an evidentiary hearing, "the burden on the plaintiff is simply to make a prima facie showing of a jurisdictional basis in order to survive the jurisdictional challenge." *Combs v. Bakker*, 886 F.2d 673, 675 (4th Cir. 1989). In deciding such a motion, "the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.* at 676.

A district court sitting in diversity, when evaluating whether it possesses personal jurisdiction over a defendant, utilizes a two-step inquiry:

> [F]irst, it must be determined whether the statutory language [of the state's long-arm statute], as a matter of construction, purports to assert personal jurisdiction over [the] defendant; and second, assuming that the answer to the first question is affirmative, it must be determined whether the statutory assertion of personal jurisdiction is consonant with the Due Process Clause of the United States Constitution.

*Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 313 (4th Cir. 1982) (citing *Haynes v. James H. Carr, Inc.*, 427 F.2d 700, 703 (4th Cir.1970)). "South Carolina's long-arm statute has been interpreted to reach the outer bounds permitted by the Due Process Clause." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997) (citations omitted). "Consequently, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" *Id.* (quoting *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135–36 (4th Cir.1996)). "The canonical opinion in this area remains *International Shoe* [*Co. v. Washington*, 326 U.S. 310 (1945)], [which held that a trial court may] exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (quoting *International Shoe*, 326 U.S. at 316).

> The analytical framework for determining whether minimum contacts exist differs according to which species of personal jurisdiction—general or specific—is alleged. *See generally ESAB Group v. Centricut,* 126 F.3d 617, 623–24 (4th Cir.1997). When a cause of action arises out of a defendant's contacts with the forum, a court may seek to exercise specific jurisdiction over that defendant if it purposefully directs activities toward the forum state and the litigation results from alleged injuries that arise out of or relate to those activities. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L.Ed.2d 404 (1984). However, when the cause of action does not arise out of the defendant's contacts with the forum, general jurisdiction may be exercised upon a showing that the

defendant's contacts are of a "continuous and systematic" nature. *Id.* at 416. [Whereupon, the court clarified that it would only determine whether the defendants' contacts were sufficient to subject them to specific jurisdiction in South Carolina because the plaintiff did not contend that general jurisdiction applied].

A defendant has minimum contacts with a jurisdiction if "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1990). Under this standard, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L.Ed.2d 1283 (1958). In determining the existence of minimum contacts, the court is mindful that it must draw all reasonable inferences from both parties' pleadings, even if they conflict, in the Plaintiff's favor. *See, e.g., Precept Med. Products, Inc., v. Klus,* 282 F. Supp. 2d 381, 385 (W.D.N.C. 2003) ("for the purposes of a Rule 12(b)(2) motion, the Court will accept the Plaintiff's version of disputed facts").

The Fourth Circuit has applied a three-part test when evaluating the propriety of exercising specific jurisdiction: (1) whether and to what extent the defendant "purposely availed" itself of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws; (2) whether the plaintiff's claims arise out of those forum-related activities; and (3) whether the exercise of jurisdiction is constitutionally "reasonable." [*Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan,* 259 F.3d 209, 215–16 (4th Cir. 2001)] (citing *Helicopteros,* 466 U.S. at 415–16, and *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 476–77, 105 S. Ct. 2174, 85 L.Ed.2d 528 (1988)).

Although the test for purposeful availment can be somewhat imprecise, significant factors typically include: defendant's physical presence in the forum state, the extent of negotiations in the forum state, the extent to which the contract was to be performed in the forum state, and who initiated the relationship. *Mun. Mortgage & Equity v. Southfork Apartments Ltd. P'ship,* 93 F. Supp. 2d 622, 626 (D. Md. 2000). Underlying these factors is the central question of whether a defendant has performed purposeful acts in the forum state such that the defendant has created a substantial

relationship with the forum state. *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners,* 229 F.3d 448, 451 (4th Cir. 2000); *ESAB Group,* 126 F.3d at 623.

*McNeil v. Sherman*, No. CIV.A. 209CV00979PMD, 2009 WL 3255240, at *2–3 (D.S.C. Oct. 7, 2009).

While the Court must construe all factual allegations in the light most favorable to the nonmoving party, the showing of personal jurisdiction "must be based on specific facts set forth in the record in order to defeat [a] motion to dismiss." *Magic Toyota, Inc. v. Southeast Toyota Distributors, Inc.*, 784 F. Supp. 306, 310 (D.S.C. 1992). In ruling on a motion to dismiss for lack of personal jurisdiction, the Court may consider evidence outside of the pleadings, such as affidavits and other evidentiary materials, without converting the motion to dismiss into a motion for summary judgment. *Id.*; *see also Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) (citing *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993) (explaining that courts may consider affidavits from any party when applying the prima facie standard)).

**Federal Rule of Civil Procedure 12(b)(3) – Venue**

Under Rule 12(b)(3), a defendant may move to dismiss an action as brought in an improper venue. On such motion, the plaintiff "bears the burden of establishing that venue is proper." *Butler v. Ford Motor Co.*, 724 F. Supp. 2d 575, 586 (D.S.C. 2010). But the plaintiff need "make only a prima facie showing of proper venue in order to survive a motion to dismiss." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365-66 (4th Cir. 2012) (citation omitted). Courts must view the facts in the light most favorable to the plaintiff when determining whether plaintiff has made a prima facie showing of proper venue. *Id.*

## DISCUSSION

Because Chen has challenged the Court's jurisdiction over this matter, the Court will consider the Rule 12 motion before proceeding to the preliminary injunction issue.

### A. Subject Matter Jurisdiction

Chen initially argued that Be Green failed to sufficiently plead facts to invoke diversity jurisdiction. (ECF No. 9-3 at 3–4.) Specifically, Chen noted that Be Green's complaint premises jurisdiction on diversity of citizenship pursuant to 28 U.S.C. § 1332(a), and alleges Be Green is a California limited liability company with a principal place of business in Ridgeland, South Carolina and Chen is a resident of Illinois. (*Id.* at 4.) For purposes of diversity jurisdiction analysis, the citizenship of a limited liability company is determined by the citizenship of all its members, not just its state of incorporation. *Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011). Chen argued that Be Green failed to plead facts relating to the citizenship of its members, and thus diversity jurisdiction had not been properly invoked. (ECF No. 9-3 at 4.)

However, Chen later conceded that the Court need not address his challenge to subject matter jurisdiction because the parties have agreed that, in the event Chen's motion to dismiss is denied as to the other grounds it asserts, Be Green should be permitted to file an amended complaint setting forth allegations relating to subject matter jurisdiction and the citizenship of membership. (*See* ECF No. 39 at 2 n.1.) Accordingly, the issue is moot and the motion to dismiss on the basis of a purported lack of subject matter jurisdiction is denied.

### B. Personal Jurisdiction

Chen next contends that the Court lacks personal jurisdiction over him because he

did not purposefully avail himself of the privileges of conducting activities in South Carolina, and he does not have the continuous, systematic, and substantial connections to the forum necessary to invoke general jurisdiction. (*See* ECF No. 9-3 at 4–9.) With respect to the question of specific jurisdiction, Chen argues that his contacts with the forum were insufficient to substantiate purposeful availment in that "[his] visits to South Carolina were sporadic, irregular, insignificant, and were all initiated by [Be Green] for the benefit of [Be Green]." (*Id.* at 7–8.)

The Court disagrees and concludes that Chen had sufficient contacts with South Carolina to fall within the ambit of the State's long arm statute, that those contacts are sufficiently related to the controversy at hand, and that the exercise of personal jurisdiction in this matter is consonant with constitutional principles of fair play and substantial justice. *See International Shoe*, 326 U.S. at 316 (establishing "traditional notions of fair play and substantial justice" as the touchstone of the due process inquiry). First, Be Green does not assert that general jurisdiction is present in this case (*see* ECF No. 33), so the Court can dispense with that portion of the analysis. With respect to the minimum contacts determination pertaining to specific jurisdiction, Chen concedes that he visited South Carolina nine times, for a total of sixteen days, when conducting his work as an employee of Be Green from November 2015 forward. (Chen Aff. ¶ 10, ECF No. 9-1.) One of the visits was to attend a meeting of Be Green's Board of Directors and the other eight times were to attend Be Green's sales and operations meetings, as well as to address manufacturing issues at Be Green's factory. (*Id.*; 2d Brown Decl. ¶ 17, ECF No. 33-1.) During these visits, Chen served as Be Green's Vice President of Technology and assisted in decisions regarding Be Green's product designs and manufacturing

equipment. (2d Brown Decl. ¶¶ 18–19.) In addition, Be Green's CEO states that Chen contacted him multiple times per week by either phone or email, which emails were sent to and from Be Green's computer server at its South Carolina facility and included communications relating to the FMC technology and Be Green's potential business with Zume. (*Id.* ¶ 20.) Finally, Mr. Brown states that Chen contacted other Be Green employees located in South Carolina, including the process engineer, finance department, and CFO, to discuss things such as technology development, materials, pricing, invoicing, and reporting. (*Id.* ¶ 21.)

Ultimately, the Court has little difficulty in finding that Chen purposefully directed business activities toward South Carolina and that Be Green's complaint alleges injuries that arise from or are related to those business activities. *See Helicopteros*, 466 U.S. at 414 ("When a controversy is related to or arises out of a defendant's contacts with the forum, the Court has said that a relationship among the defendant, the forum, and the litigation is the essential foundation of in personam jurisdiction." (citation and quotation marks removed)). Be Green has made a prima facie showing of personal jurisdiction through demonstrating the following: Chen served as a corporate officer and Board member of Be Green while its factory and corporate headquarters were located in South Carolina; Chen travelled to South Carolina on multiple occasions to advise Be Green regarding its corporate objectives, its designs, its equipment, and its operations; Chen conducted frequent business communications with his Be Green associates in South Carolina through Be Green's computer server in the State; and Chen regularly communicated with Be Green's CEO about key issues in the case—to wit, the development of the FMC technology and the Zume business opportunity. Accordingly,

Chen's conduct and connection with South Carolina "are such that he should reasonably anticipate being haled into court [here]." *World–Wide Volkswagen*, 444 U.S. 286, 297 (1990). The presence and centrality in this lawsuit of Chen's employment contracts with Be Green also counsel toward a finding of personal jurisdiction. Chen makes much of the facts that Be Green was headquartered in California, not South Carolina, when the parties entered into the 2015 Agreement, and he only ever came to South Carolina by his employer's initiative. (*See* ECF No. 39 at 3–9.) However, it is immaterial that Be Green was headquartered in California earlier in the employment relationship, where Chen continued to direct business activities toward Be Green once it moved to South Carolina and where substantive portions of the employment contract were performed in forum. Moreover, Chen cannot duck personal jurisdiction by claiming that his employer set up all his business trips to South Carolina, where his service to the company as Vice President of Technology and member of the Board was a result of his own ongoing volitional choice. *See Nolan*, 259 F.3d at 216 ("A prospective defendant need not initiate the relevant 'minimum contacts' to be regarded as purposefully availing himself of the privileges of conducting activity in the forum state.") The business activities conducted by Chen in South Carolina and his business communications directed toward the state are connected to Be Green's claims regarding the usurpation of its allegedly proprietary and confidential information, so the "arising from" prong is also satisfied. *See id.* at 216–17 (affirming district court's finding that the conditions for permissible exercise of specific personal jurisdiction were satisfied where trademark infringement claims were connected to defendant's business activities directed toward the forum). Accordingly, the Court finds that the minimum contacts analysis leads to a finding that personal jurisdiction is

appropriate. *See CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285 (4th Cir. 2009) (finding—by applying Virginia's long-arm statute which, like South Carolina's, extends to the ends of due process—minimum contacts existed where an out-of-state representative of defendant company visited the forum state once to initiate a business deal and a second time to attend a board meeting).

Furthermore, the exercise of jurisdiction over Chen is constitutionally reasonable in this case. "In determining whether jurisdiction is constitutionally reasonable, we may evaluate the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Nolan*, 259 F.3d at 217 (citing *Burger King*, 471 U.S. at 477) (quotation marks omitted). Although defending a lawsuit in South Carolina may be inconvenient for Chen, this inconvenience alone is not so unfair as to present a constitutional barrier to jurisdiction. *See Burger King,* 471 U.S. at 474 ("[B]ecause modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." (citation and quotation marks omitted)). Travel between Illinois and South Carolina is not unduly burdensome, as demonstrated by Chen's numerous trips to the forum during his employment relationship with Be Green. The Court finds that South Carolina has an interest in adjudicating this action because it involves alleged breaches of contract and tortious conduct against a South Carolina company and that company's operations in the

State. Be Green certainly has an interest in seeking relief in its home State, where it alleges its injury occurred. Finally, the Court finds that conducting the trial in South Carolina will promote efficient resolution of the controversy given that Be Green's principal place of business is here and a significant portion of the witnesses and evidence will be located here. In summary, the Court possesses personal jurisdiction over Chen and his motion to dismiss on the basis of a purported lack of personal jurisdiction is denied.

### C. Venue

Finally, Chen asserts that venue in South Carolina is improper because "[n]one of the event[s] or omissions giving rise to all of [Be Green's] claims occurred in South Carolina." (*See* ECF No. 9-3 at 9–12.) In the alternative to dismissal for improper venue, Chen argues that this case should be transferred to the Northern District of Illinois because the parties agreed that Illinois law would control any disputes that arose out of the employment agreements, and further agreed that the courts in Illinois "shall" have jurisdiction in any action, suit, or proceeding against Chen and that he would submit to the personal jurisdiction of such courts. (*Id.* at 12–14; *see also* 2015 Agreement ¶ 16, ECF No. 1-1 at 9–10 ("Choice of Law" clause); 2018 Agreement ¶ 2, ECF No. 1-2 at 7 (identical clause).) Chen's motion even suggests that the language of the agreements' choice of law clause means that Illinois is the exclusive forum for disputes arising between the parties. (*See* ECF No. 9 at 2 ("Pursuant to Illinois law, the word 'shall' when used in the context of a forum selection clause means that the forum is exclusive." (citations omitted).)

First, the choice of law clause in the employment agreements does not grant Illinois exclusive jurisdiction over this case, but rather permissive jurisdiction. "A general maxim

in interpreting forum-selection clauses is that an agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere unless it contains specific language of exclusion." *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 290 (4th Cir. 2007) (citation and quotation marks omitted). The language at issue states: "Executive agrees that the state and federal courts located in the State of Illinois shall have jurisdiction in any action, suit or proceeding against Executive based on or arising out of this Agreement . . . ." (2015 Agreement ¶ 16; 2018 Agreement ¶ 2.) In *IntraComm* the Fourth Circuit contrasted a forum-selection clause that stated—"The parties agree that . . . the courts of the State of Michigan shall have personal jurisdiction . . . ."—with a forum-selection clause that stated—"Jurisdiction shall be in the state of Colorado." 492 F.3d at 290. In explaining that the first example was permissive and the second was mandatory, the *IntraComm* court stated, "Although both clauses . . . use the word 'shall,' the word's meaning differs with context." *Id*. The "Choice of Law" clause in the instant case uses the word "shall" in the same manner as the forum-selection clause that the Fourth Circuit determined to be permissive in *IntraComm*. Thus, the clause is permissive and not mandatory.

Finally, venue in South Carolina is proper because this case involves alleged harm to a South Carolina resident, Be Green. A civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(b)(2). Courts have held that when an employee's actions cause alleged harm to an employer company that is a resident of the forum, venue is proper in the forum state. *See, e.g.*, *Vessel Med., Inc. v. Elliott*, No. 6:15-cv-00330-MGL, 2015 WL 5437170, at *7 (D.S.C. Sept. 15, 2015). Be Green's claims concern the purported misappropriation of confidential and proprietary business processes and equipment configurations

allegedly belonging to a South Carolina corporation, and allegedly tortious interference with prospective contractual relations from which Be Green would have benefited in South Carolina. (*See* Compl., ECF No. 1.) Moreover, Be Green alleges that its CEO, Jim Brown, was working with Chen to develop the FMC technology for use at Be Green's South Carolina factory, that Chen attended a Board of Directors meeting in 2017 where a pilot program for FMC technology was discussed, and that the Board "authorized" Chen to continue with development and building of a prototype FMC for use in manufacturing molded fiber packaging. (*Id.* ¶¶ 16–18.) Thus, the Court concludes that for purposes of the venue statute, a substantial part of the events giving rise to Be Green's claims occurred in South Carolina. *See Vessel Med.*, 2015 WL 5437170, at *7 (holding that venue was proper in South Carolina under 28 U.S.C. § 1391(b)(2) where plaintiffs' action concerned the alleged misappropriation of trade secrets and property of a South Carolina corporation and the alleged solicitation of a South Carolina corporation's clients and employees). Accordingly, the Court finds that Be Green has made a prima facie showing of proper venue and the motion to dismiss on this basis is denied. Chen's alternative request that the case be transferred to the Northern District of Illinois is likewise denied.[2]

### D. Preliminary Injunction

The Court will now proceed to an analysis of the *Winter* factors, each of which Be Green must establish by a "clear showing" in order to be entitled to the entry of a

---

[2] "Generally, the test of whether an action should be transferred to another jurisdiction is one of balancing convenience." *Avant v. Travelers Ins. Co.*, 668 F. Supp. 509, 510 (D.S.C. 1987). "Unless the balance is strongly in favor of the movant, the plaintiff's choice of forum should rarely be disturbed." *Id.* (citations omitted). "[T]he moving party has the burden of establishing whether there should be a change of venue." *Id.* (citations omitted). The Court finds that Chen has not satisfied his burden to establish that the balance of convenience strongly tips in his favor merely because he lives in another state and because the Court will have to apply Illinois law when adjudicating this dispute. Be Green has an interest in resolving this matter in South Carolina, where its principal place of business, several employees who will serve as witnesses, and relevant evidence are located. Thus, Be Green's choice of forum will not be disturbed.

preliminary injunction. *Real Truth About Obama*, 575 F.3d at 346. At the outset, the Court notes that Be Green's briefing on the preliminary junction issue is entirely focused on its claims for breach of contract under counts 1 and 2 of the complaint. (*See* ECF Nos. 7-1, 35, 42-1, 45.) Accordingly, Be Green's request for an injunction will be assessed based on the showing that Be Green has or has not made on its breach of contract claims.

First, Be Green asserts that it is likely to succeed on the merits of its claims because the 2015 and 2018 Agreements are valid and enforceable contracts, because Chen breached his confidentiality obligations under the Agreements by disclosing Be Green's confidential and proprietary information concerning FMC technology, because Chen breached the Agreements by failing to assign to Be Green patents and patent applications relating to the FMC technology, and because Chen breached his non-competition obligations by diverting Be Green's business opportunity with Zume. (ECF No. 7-1 at 12–15.) Chen responds that Be Green is not likely to succeed on the merits of its breach of contract claims because: (1) Be Green has no ownership rights or entitlement to the FMC technology at issue in the patents addressed in the complaint, which technology rightfully belongs to Shurcon; (2) Be Green has not identified with sufficient specificity *what* confidential information is at risk of disclosure or allegedly already has been disclosed; and (3) the Confidentiality Provision and Non-Competition Provision are unenforceable under Illinois law. (ECF No. 30 at 18–30.) However, the core of Chen's defense to the preliminary injunction request is that the conduct of which Be Green complains—Chen's involvement with Shurcon's development of the FMC technology for the benefit of Shurcon—was contemplated by the parties, who agreed, in the Permitted Activities Clause, that such activities were allowed and in the Assignment Provision, that

Be Green does not have a claim to any resulting inventions. (*See id.* at 19–23.) Be Green argues in reply that the Permitted Activities Clause only applies to the Non-Competition Provision—not the Assignment and Confidentiality Provisions, that it is limited to activities as of the "Effective Date"—October 16, 2015, and that the Assignment Provision refutes Chen's position—requiring assignment of any intellectual property developed by Chen that "relates to the business of the Company." (*See* ECF No. 35 at 6–10.)

After careful review, the Court finds that Be Green has not made a clear showing that its breach of contract claims will succeed on the merits, and the first *Winter* factor is not satisfied. One need only read the parties' wholly divergent presentations of the factual background of this case—each supported by competent declarations and affidavits—to quickly understand that fundamental disputes of fact preclude the relief Be Green seeks. Be Green presents the dispute as a straightforward breach of Chen's contractual obligations: Chen had access to Be Green's confidential information regarding the FMC technology and a duty not to disclose it to third parties, but he disclosed it anyway in order to benefit himself and the Chinese company he controls; Chen had a duty not to enter into or engage in any business that competes with Be Green's business, but he diverted the Zume deal anyway in order to benefit himself and Shurcon; Chen had a duty to assign intellectual property rights to anything he invented that related to Be Green's business, but he surreptitiously patented the FMC technology in China so as to usurp those intellectual property rights. Meanwhile, Chen presents the case as equally straightforward in the opposite direction: Shurcon, with Chen's input but not by his sole effort, developed the FMC technology wholly independent of Be Green and without any utilization of Be Green resources or personnel; when Be Green hired Chen, Be Green management was

fully aware of Chen's work with Shurcon and memorialized its approval of Chen's continuing work for Shurcon's benefit as an express carve out from the prohibitions on competitive activity in the employment agreements; because Be Green was in the business of manufacturing and selling packaging products—not the business of inventing, developing, and manufacturing machinery used to manufacture packaging, like Shurcon—the Assignment Provision does not apply to the FMC technology and Shurcon's development of the FMC technology cannot fairly be characterized as a result of work Chen performed for Be Green. As with most disputes of this nature, an accurate interpretation of the parties' rights and responsibilities is likely less binary than either party would choose to admit. But in any case, resolution of the breach of contract claims is not so clear and inevitable as to permit the sweeping, mandatory injunctive relief Be Green has requested.

Under the Permitted Activities Clause, the restrictive covenants barring Chen from competing with Be Green anywhere in the world "shall not apply to the activities of [Chen], or [Shurcon], . . . to the extent such activities are specifically set forth on **Exhibit A** and conducted by [Chen and Shurcon] as of the Effective Date." (ECF No. 1-1 § 6(b)(v).) Exhibit A states that Chen and Shurcon are permitted to engage in the "manufacture, *development and sale* of equipment, molds and technology used to manufacture molded fiber products." (*Id.* at 11 (emphasis added).) Though the Permitted Activities Clause only carves out activities conducted by Chen and Shurcon "as of the Effective Date," the list of "Permissible Activities" includes the "development" of manufacturing technology and "sale" of equipment, in which Chen and Shurcon were indisputably engaged at all times relevant to this action. This broad description of the activities shielded from the Non-

Competition Provision permits at least a colorable interpretation, advanced by Chen, of the parties' business arrangement as allowing Shurcon's *ongoing* development of manufacturing tools and machinery wholly distinct from Be Green's manufacture of packaging products and *ongoing* sale of such tools and machinery to third parties, such as Zume—"ongoing" in the sense that these activities were already occurring before the employment agreements were signed and would continue thereafter. This is not to say that Chen will ultimately prevail on the issue of whether he breached the Non-Competition Provision, but rather that an interpretation of the contractual language will turn on the parties' intent and other facts that are vigorously disputed.

While it is true that the Permitted Activities Clause expressly applies to the Non-Competition Provision only, and not to the Confidentiality and Assignment Provisions, it would be improper at this stage to construe the Confidentiality and Assignment Provisions while ignoring the parties' putative understanding that Chen was to continue his machinery development work for Shurcon independent of his work for Be Green. Chen contends that Be Green made no investment in Shurcon's work developing the FMC technology, devoted no engineering resources, contributed no inventive aspects, and provided no funding to the project. Moreover, while Chen was a co-inventor of the FMC technology, at least two other Shurcon engineers are disclosed as co-inventors in the relevant patent applications. (Chen Decl. ¶ 17.) These assertions have gone uncontested in Be Green's briefing.

The Assignment Provision states, in pertinent part:

[Chen] has no obligation to assign any idea, discovery, invention, improvement, software, writing or other material or design that [Chen] conceives and/or develops entirely on [Chen's] own time without using [Be Green's] equipment, supplies, facilities, or trade secret information *unless*

the idea, discovery, invention, improvement, software, writing or other material or design: (x) *relates to the business of [Be Green]*, or (y) relates to [Be Green's] actual or demonstrably anticipated research or development, or (z) results from any work performed by [Chen] for [Be Green].

(ECF No. 1-1 ¶ 6(f)(i) (emphasis added).) The "Definitions" section of the employment agreements defines "Company's business" as "the design, *manufacture* and distribution of molded or thermoformed pulp or fiber products." (*Id*. ¶ 7(a) (emphasis added).) When considered against the backdrop of Be Green's alleged total lack of involvement in creation of the FMC technology, and in the corresponding context of an alleged understanding between the parties that Chen's work for Shurcon was independent of his work for Be Green, the Court cannot conclude that Be Green has made a clear showing that its claim for breach of the Assignment Provision will prevail on the merits. One possible interpretation of the Assignment Provision is that the subset of intellectual property which "relates to the business of [Be Green]" does not fairly include the invention, development, and manufacturing of the *machinery* used to make packaging. Be Green, Chen would argue, is in the business of *acquiring* machinery for use in its manufacturing operations, not the business of making such machinery. Of course, Be Green will argue (and already has argued (*see* ECF No. 35 at 6–8)), that if the "Company's business" includes the "manufacture" of packaging products (*see* ECF No. 1-1 ¶ 7(a)), and manufacturing those products requires machinery, then any manufacturing machinery that Chen invented subsequent to execution of the employment agreements "relates to" Be Green's business and is subject to Chen's assignment obligation. Again, in finding that the first *Winter* factor is not satisfied the Court is by no means forecasting that Chen will prevail on the question of whether intellectual property rights to the FMC technology

must be assigned to Be Green under the contracts. Rather, the Court is merely acknowledging that material disputes remain regarding Be Green and Shurcon's rights to the FMC technology given their relative involvement in procuring said technology and the scope of their respective businesses.

Finally, because there is a colorable case to be made that the technology in dispute belongs to Shurcon, not Be Green, there is a related case to be made that whatever information Chen disclosed to Zume, or others, was not confidential *to Be Green*. Accordingly, Be Green has not made a clear showing that it will succeed on the merits of its breach of contract claims premised on Chen's alleged breach of the Confidentiality Provision. In summary, the Court finds that Be Green has failed to establish a likelihood of success on the merits under both the heightened standard for a mandatory injunction and the traditional preliminary injunction standard pursuant to *Winter*.

Having found that Be Green has not satisfied the first *Winter* factor, a discussion of the remaining factors would be superfluous. Therefore, the Court dispenses with any further discussion of the proposed preliminary injunction and hereby denies Be Green's motion.

## <u>CONCLUSION</u>

For the reasons set forth above, Be Green's motion for a preliminary injunction (ECF No. 7) is DENIED, and Chen's motion to dismiss (ECF No. 9) is DENIED.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

August 26, 2020
Greenville, South Carolina